UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
NEIMAN NIX and DNA SPORTS PERFORMANCE
LAB, INC.,

                        Plaintiff,

           -against-

MAJOR LEAGUE BASEBALL, OFFICE OF THE
COMMISSIONER OF BASEBALL, D/B/A MAJOR
LEAGUE BASEBALL, ROBERT D. MANFRED, JR.,
ALLAN H. "BUD" SELIG, NEIL BOLAND, and
AWILDA SANTANA,

                        Defendants.
-------------------------------------------------------------------X

COMPLAINT

Docket No.:

Jury Trial Demanded

       Plaintiff, NEIMAN NIX, by and through his attorney, Vincent P. White, alleges upon knowledge as to himself, his own actions, and jurisdiction over the parties, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1.    This action is brought pursuant to Florida State tort law, New York State tort law and any other causes of action which can be inferred from the facts set forth herein.

2.    The jurisdiction of this Court is invoked under 28 U.S.C. § 1332, as there is complete diversity between the parties and the amount in controversy exceeds $75,000.

3.    Venue is proper pursuant to 28 U.S.C. § 1391, since all of the defendants reside in different districts within the State of New York.

## PARTIES

4.    Plaintiff, Neiman Nix ("Nix" or "Plaintiff"), was a resident of Miami-Dade County,

1

State of Florida at all relevant times herein. Plaintiff has subsequently relocated his permanent residence and now resides in Montgomery County, State of Texas.

5.       Plaintiff, DNA Sports Performance Lab, Inc. ("DNA Sports Lab), is a foreign corporation, incorporated in the State of Florida with its principal place of business located at 2555 Collins Ave, Miami Beach, Florida 33140 and transacting business internationally.

6.       Defendant, Major League Baseball, is an unincorporated association whose members are the thirty (30) Major League Baseball Clubs. Its principal place of business located at 245 Park Avenue, New York, New York 10167.

7.       Defendant, Office of the Commissioner of Baseball, d/b/a Major League Baseball, is an office created pursuant to the Major League Agreement entered into by the member clubs of Major League Baseball. Its principal place of business is located 245 Park Avenue, New York, New York 10167.

8.       Defendant, Robert D. Manfred, Jr. ("Manfred"), is an MLB Executive and current Commissioner of Baseball. At relevant times herein, Manfred served as the Chief Operating Officer of Major League Baseball, from September 2012 to January 2015, managing the Commissioner's Office on behalf of former Commissioner, Bud Selig ("Selig"), and the Executive Vice President for Labor Relations and Human Resources from 1998 to 2012.

9.       Defendant, Allan H. "Bud" Selig ("Selig"), is the current Commissioner Emeritus of Major League Baseball serving as advisor to Manfred. At all relevant times herein, Selig served as the ninth Commissioner of Baseball from July 1998 to January 2015.

10.      Defendant, Neil Boland ("Boland"), is a computer analyst and MLB's Vice President of Information Security and a former investigator for the DOI.

11.      Defendant, Awilda Santana ("Santana"), at all relevant times herein, was and still is

2

an investigator employed by MLB's DOI.

## FACTS

### *Plaintiff's Background and History with MLB*

12.     Plaintiff, Neiman Nix, is a former professional baseball player drafted right out of high school by the Cincinnati Reds in 1998 and went on to play for the Milwaukee Brewers and various minor league teams until 2003. During that time, Nix suffered severe injuries to his pitching arm causing him to have nine surgeries and subsequently ending his professional baseball career.

13.     Nix's injuries occurred due to the way he was taught to throw certain pitches once he got to the professional level. As a result, during the rehabilitation of his arm, Nix worked with several of the top orthopedic surgeons, trainers, bio-mechanists and other professionals not only to rehabilitate his arm, but to learn how to properly apply force while throwing so that injuries like the ones he suffered did not occur in the future.

14.     In 2006 Nix founded the American Baseball Institute ("ABI"), a year-round pro-player development academy that ran open tryouts free of charge to athletes 18 years and older. There, Nix taught his players how to throw with the proper force in order to help them avoid injuries similar to the ones he suffered during his time at the professional level. By 2009 ABI had grown exponentially, causing Nix to relocate to a larger facility, the former Phillies spring training home in Clearwater, Florida.  ABI's main purpose was to train and develop athletes.

15.     Nix invited MLB teams and the MLB Scouting Bureau to watch his players at ABI. Indeed, all thirty MLB teams sent scouts to ABI frequently to watch and sign players from Nix's ABI.

16.     At no time, however, did Nix represent that any individuals employed by ABI were

3

MLB scouts nor did he maintain employees at his camp that were MLB scouts or otherwise associated with the MLB.

17.　　　Upon information and belief, the MLB viewed ABI as a free agent league that created competition and infringed upon MLB's rights.

18.　　　In or around August 2011, without contacting Nix defendant Santana, an investigator for MLB's Department of Investigations, began contacting current and former players at ABI, coaches, and other members of ABI and the baseball community, alleging that Nix was infringing on MLB's rights by misrepresenting certain individuals as MLB scouts, representing himself as an MLB agent, and/or running fake tryouts.

19.　　　Indeed, in late 2011, former MLB player and manager David Kent ("Kent") was contacted by an MLB investigator asking him what he knew about Nix's camp and falsely stated that Nix was luring players into his camp by having people impersonate MLB Scouts. Kent, having worked with Nix at ABI several times, knew this was false and informed the investigator that he had personal knowledge that numerous scouts from professional teams and colleges did visit ABI, not impersonators. In fact, Kent would often contact MLB scouts himself and recommend that they go to ABI to see certain players.

20.　　　At this point, Nix had heard from several friends and colleagues, including Kent that they had been contacted by an MLB investigator making similar allegations. Nix himself had still not been contacted by anyone from the MLB.

21.　　　In or about November 2011, MLB investigator Santana contacted Nix for the first time regarding these allegations, at which point Nix explained that the allegations were false and likely came from a disgruntled ex-employee who was fired from ABI for cause, would not vacate an apartment rented by Nix, and had a personal vendetta against him.

4

22.     By the time Nix was contacted, the rumors regarding Nix making the alleged misrepresentations had already been widespread by MLB's investigators and the damage to Nix's reputation and integrity in the baseball community was already done.

23.     On or about December 13, 2011, Nix sent a letter to the Office of the Commissioner of Baseball and Santana again notifying them that the allegations were false and may have come from a disgruntled ex-employee with a vendetta against Nix, explaining that MLB's investigators were making false statements to Nix's clients and that these slanderous remarks were causing Nix's and ABI's reputations irreparable harm.

24.     At no time did anyone from MLB respond to Nix's letter and the investigation continued.

25.     As a result of MLB's conduct, many players at ABI left abruptly, and in or about January 2012, Nix was forced to sell the majority of his shares in ABI at a fraction of their worth.

### *MLB's Crackdown on Performance Enhancing Drugs and Creation of Department of Investigations*

26.     On December 13, 2007, former Maine Senator George J. Mitchell released a report ("Mitchell Report") to the Commissioner of Baseball, Selig, outlining an independent investigation describing how and why the use of anabolic steroids and other performance enhancing drugs had emerged in Major League Baseball, and set forth recommendations to the Commissioner regarding how MLB could more effectively address this problem, including the establishment of an investigative department.

27.     In January 2008, Commissioner Selig announced the creation of a new Department of Investigations ("DOI") within the MLB in immediate response to the Mitchell Report's

5

recommendation to significantly increase MLB's ability to investigate allegations of the use of performance enhancers.

28.     The DOI began operations immediately and was headed by former NYPD Deputy Chief Daniel T. Mullin, and Senior Director of Investigations, George Hanna.

29.     The DOI functions "independently of the MLB clubs and [has] broad authority to conduct investigations." However, the DOI lacks certain investigative powers including, *inter alia*, subpoena power.

30.     As a result, during the DOI's investigation into the Biogenesis clinic in Coral Gables, Florida, Commissioner Selig hired a second team of private investigators, without informing the existing DOI investigators.

31.     Indeed, by August 2012, the DOI's primary target was wellness and anti-aging clinics in Florida and Arizona.

### *DNA Sports Lab and MLB's Second Investigation into Nix*

32.     In or about May 2012, Plaintiff Nix established a state of the art sports science testing facility for human performance called DNA Sports Performance Lab, Inc. ("DNA Sports Lab"), in Miami Beach, Florida.

33.     DNA Sports Lab is a diagnostic training and sports medicine clinic that specializes in the research and development and sale of natural and bio-identical substances to serve as an alternative to harmful performance-enhancing drugs like synthetic anabolic steroids.

34.     Nix, after suffering his own injuries that ended his professional career, had invested much of his life to becoming a sports science guru, looking at every facet of performance including, *inter alia*, sleep, nutrition and training, and tested his clients in strength, endurance, efficiency, and recovery in order to help athletes avoid injuries.

6

35.     Indeed, Nix purchased innovative machinery such as body scanners, hyperbaric chambers, dyno strength machines, bio-electrical medical devices, and motion image tracking machines in order to test and research existing performance-enhancing supplements with a team of hired doctors in order to develop new, safe, effective, and legal supplements.

36.     Nix's clientele at DNA Sports Lab includes both professional and nonprofessional athletes, and members of the military.

37.     At no time did Nix work with any baseball players at DNA Sports Lab since he was bound by a non-compete agreement with ABI in order to maintain ten percent ownership in ABI that he had retained.

38.     DNA Sports Lab generates business internationally using online services including, *inter alia*, DNA Sports Lab's website (www.DNAsportslab.com), YouTube, and Facebook. It completes its international transactions by using the online worldwide payment system PayPal.

39.     DNA Sports Lab develops and sells a specialty supplement line of Bio-Identicals/nutraceuticals, which are custom made formulas made for individual clients with varying ingredients depending on the client's individual test results performed by Nix's team of doctors and the client's desired result from the supplement to naturally help the human body perform.

40.     One of the main ingredients used by Nix and DNA Sports Lab come from Bio-identical Insulin like Growth Factor ("IGF-1"), which is derived from elk antlers. The antler's velvet is scientifically shaved off and made into very potent liquids and creams using Nix's and DNA Sports Lab's scientifically developed methods to produce product with a high ration of growth factors that naturally help the human body perform. This product differs from the basic deer antler sprays that are on the market.

7

41.    Indeed, this line of products has been approved by the World Anti-Doping Agency ("WADA"), an international independent agency established in 1999 to promote and coordinate the fight against doping in sport internationally.

42.    Nix, through DNA Sports Lab, does not work with MLB players at DNA Sports Lab and has never tried to market or recommend this product to any MLB player or knowingly sold his product to an MLB player.

43.    Nix has never sold testosterone or anabolic steroids and refers any clients seeking hormone based products to outside medical doctors.

44.    In fact, Nix's goal in starting DNA Sports Lab was to help eliminate harmful performance-enhancing drugs by creating natural and safe alternatives that do not require a prescription.

45.    Indeed, representatives from DNA Sports Lab visit professional team organizations, gyms, and colleges to advocate against illegal synthetic steroids.

46.    Although Nix has never sold, recommended or marketed the substance banned by the MLB to any MLB player, the MLB's DOI unjustifiably targeted DNA Sports Lab and Nix.

47.    In early 2013, the Biogenesis scandal broke in a Miami Times news article uncovering the Biogenesis scandal involving many big name MLB Players including, *inter alia*, Alex Rodriguez, which was reported by a former Biogenesis employee. Upon information and belief, in response, the MLB deployed approximately fifty (50) investigators to the South Florida area. Indeed, defendants Selig and Manfred both announced publically that they would be looking into every "anti-aging" clinic in South Florida.

48.    Upon information and belief, from February to April 2013, MLB investigators, some of whom represented themselves as FBI and DEA agents, contacted many of DNA Sports Lab's

8

clients and Nix's colleagues inquiring about Nix and accusing him of selling illegal substances to MLB players.

49.     Upon information and belief, defendant Santana and Investigator Mullin participated in this investigation by contacting some of the above individuals. Investigator Mullin oversaw the investigation which was run by defendants Manfred and Selig.

50.     Furthermore, upon information and belief, former DOI investigator for MLB, Ed Dominguez, as well as other DOI investigators were directed by Defendant Manfred and Investigator Mullin to cease communicating with DEA agents seeking to ensure investigations were conducted legally and properly, instead instructing MLB investigators to falsely represent themselves to be or to be working with DEA or FBI agents.

51.     Indeed, in early 2013, David Kent was again contacted by MLB investigators and was falsely told that Nix was selling illegal performance enhancing drugs to players. Kent was told that MLB was working with the government on a drug scandal that Nix was tied to.

52.     At this time, the use of illegal and banned performance-enhancing drugs was a highly public issue due to the Biogenesis scandal and as a result of MLB's false accusations to many members of the baseball community and Nix's clientele, many believed Nix was tied to the scandal and his reputation was quickly tarnished.

53.     Nix, by and through his former attorney, Alex Hornik, again sent a letter to the MLB requesting that they stop contacting Nix's clients as the false accusations made by the MLB investigators were causing irreparable harm to Nix's and DNA Sports Lab's reputation.

54.     In response to the letter, Nix, by and through his attorney Hornik, received a phone call from Investigator Mullin, threatening that if Nix did not "drop it" with the MLB, Mullin would use his connections in law enforcement to have Nix criminally charged for making

9

fraudulent misrepresentations to minors. As a result of Mullin's threat, Hornik resigned from Nix's case. Again, Nix has never worked with clients under the age of 18, so the threatened charge was unjustified and used to intimidate Nix in order to allow MLB to continue to investigate and slander Nix. Upon information and belief Mullin was pressured to engage in such extraordinary tactics by Major League Baseball's leadership in order to cover up DOI wrongdoing.

55.     MLB continued their conduct ignoring Nix's letter, and by April 2013, several clients had stopped buying products from Nix. Nix simultaneously noticed an increase in body builders coming to DNA Sports Lab seeking banned substances, due to a false perception of DNA Sports Lab that had been created by MLB's false representations as to DNA Sports Lab's business operations. Nix turned these individuals away.

56.     At no time did Nix sell and/or recommend any of his products to any MLB players, nor is he aware of any third party attempting to do the same with his products. No MLB player has ever tested positive for any such substance sold by Nix.

57.     As a result of MLB's unjustified investigation, DNA Sports Lab and Nix suffered irreparable harm to their reputations, lost many existing clients, and as evidenced by a decrease in sales following MLB's conduct, lost many prospective clients.

### *Social Media Accounts*

58.     On February 18, 2014, Nix filed a complaint against Defendants in the Circuit Court of the 11th Judicial Circuit, in and for Miami Dade County, Florida, which was subsequently dismissed without prejudice.

59.     Within approximately one day of Nix filing said complaint, MLB became aware of

the filing through various media outlets and was notified of the impending litigation prior to filing by Nix's former attorney, Sholom Boyer ("Boyer").

60. Upon information and belief, in retaliation for Nix's filing of the complaint, MLB began attacking/hacking DNA Sports Lab's social media accounts, severely disrupting Nix's ability to do business.

61. At about the same time, Nix's Former attorney Boyer's computer was hacked into and destroyed.

62. Neil Boland ("Boland") is currently MLB's Vice President of Information Security and computer analyst.

63. Upon information and belief, Investigator Mullin hired defendant Boland initially to work for the DOI.

64. Upon information and belief, after learning of Boland's expertise as a computer analyst and his ability to skillfully enter computers and accounts through various means and exploits, defendant Manfred pulled Boland out of the DOI and instructed him to report directly to Manfred as his "right hand man."

65. Upon information and belief, MLB's conduct in attacking DNA Sports Lab's social media accounts was undertaken by or at the direction of Boland.

66. For example, on or about February 19, 2014, DNA Sports Lab's YouTube account was flagged 17 times from a fake and/or untraceable IP address.

67. By March 13, 2014, DNA Sports Lab's YouTube account was taken down entirely.

68. DNA Sports Lab elicits much of its business through a YouTube video posted on its website describing its products. To this day, DNA Sports Lab is banned from posting on YouTube.

11

69.     By early April 2014, DNA Sports Lab's Facebook account had also been taken down.

70.     On April 15, 2014, Nix's PayPal account was taken down cutting off his ability to do most of his business, since most of his sales are done online, especially with his international clients.

71.     Nix hired computer expert Alicia Wright ("Wright") to investigate the take down of his accounts.

72.     Wright's contact at YouTube informed her that they received reports that Nix was associated with Biogenesis and the sale of illegal drugs to players. These reports were linked to an IP Address in New York, where MLB's headquarters are located.

73.     As a result of MLB interfering with DNA Sports Lab's social media and PayPal accounts, DNA Sports Lab experienced a huge decrease in online sales and monetary loss.

74.     Since opening for business, DNA Sports Lab has done millions of dollars in sales internationally by advertising its product in a YouTube video appearing on its website, on Facebook, and completing transactions using PayPal.

75.     As a result, MLB's conduct in taking down DNA Sports Lab's social media accounts has cost Nix and DNA Sports Lab millions of dollars in sales.

## AS AND FOR A FIRST CAUSE OF ACTION
### *Tortious Interference with Business Relationship under Florida State Tort Law*

76.     Plaintiffs repeat, reiterate, and reallege each and every allegation made in the above paragraphs of this complaint.

77.     Nix and DNA Sports Lab had existing business relationships with its clients, which defendants became aware of during their investigation in South Florida.

78.     In an effort to again take down one of Nix's business, defendants MLB and The

12

Office of the Commissioner of Baseball, by and through its DOI, intentionally and unjustifiably targeted DNA Sports Lab in an investigation for the sale of banned performance enhancers to MLB players, despite the fact that Nix did not work with any MLB players and never marketed, recommended or sold any such substance to any MLB player, nor has any MLB player ever tested positive for any such substance.

79.    Defendant Santana acting on behalf of defendants Selig, Manfred, the MLB and Office of the Commissioner of Baseball (collectively "MLB"), used improper means during their investigation of Nix and DNA Sports Lab by misrepresenting themselves as law enforcement, and/or as working with law enforcement, and by making unjustifiably fraudulent misrepresentations to Nix's clients and prospective future clients of DNA Sports Lab, that Plaintiffs were in the business of selling illegal/banned substances and/or were in some way associated with the Biogenesis scandal.

80.    An investigator, acting on behalf of the MLB, used intimidation and illegal conduct by threatening to use his connections in law enforcement to bring false charges against Nix, in order to continue their investigation and interference with DNA Sports Lab's business.

81.    Defendant Boland, acting on behalf of the MLB, used improper means and illegal conduct in order to hack and take down DNA Sports Lab's social media accounts including, YouTube, Facebook, and PayPal, causing further damage to Plaintiffs' ability to do business.

82.    As a result of defendants' tortious interference with Nix's and DNA Sports Lab's business relationships, Nix's and DNA Sports Lab's reputation was tarnished in the athletic community and DNA Sports Lab lost many existing and prospective clients

83.    As a result of defendants' further conduct in intentionally and unjustifiably interfering with Nix's and DNA Sports Lab's online media platforms, Plaintiffs' ability to elicit

13

and transact business worldwide was severely restricted and as a result Plaintiffs' lost millions of dollars' worth of existing clients and prospective business.

## AS AND FOR A SECOND CAUSE OF ACTION
### *Tortious Interference with Business Relations/Prospective Economic Advantage under New York State Tort Law*

84.     Plaintiffs repeat, reiterate, and reallege each and every allegation made in the above paragraphs of this complaint.

85.     Nix and DNA Sports Lab had existing business relationships with its clients, which defendants became aware of during their investigation in South Florida.

86.     In an effort to again take down one of Nix's business, defendants MLB and The Office of the Commissioner of Baseball, by and through its DOI, intentionally and unjustifiably targeted DNA Sports Lab in an investigation for the sale of banned performance enhancers to MLB players, despite the fact that Nix did not work with any MLB players as result of the non-compete agreement entered into with MLB, Nix never marketed, recommended or sold any such substance to any MLB player, nor has any MLB player ever tested positive for any such substance.

87.     Defendant Santana acting on behalf of defendants Selig, Manfred, the MLB and Office of the Commissioner of Baseball (collectively "MLB"), used improper means during their investigation of Nix and DNA Sports Lab by misrepresenting themselves as law enforcement, and/or as working with law enforcement, and by making unjustifiably fraudulent misrepresentations to Nix's clients and prospective future clients of DNA Sports Lab, that Plaintiffs were in the business of selling illegal/banned substances and/or were in some way associated with the Biogenesis scandal.

14

88.    Investigators acting on behalf of the MLB, used intimidation and illegal conduct by threatening to use his connections in law enforcement to bring false charges against Nix, in order to continue their investigation and interference with DNA Sports Lab's business.

89.    Defendant Boland, acting on behalf of the MLB, used improper means and illegal conduct in order to hack and take down DNA Sports Lab's social media accounts including, YouTube, Facebook, and PayPal, causing further damage to Plaintiffs' ability to do business.

90.    As a result of defendants' tortious interference with Nix's and DNA Sports Lab's business relationships, Nix's and DNA Sports Lab's reputation was tarnished in the athletic community and DNA Sports Lab lost many existing and prospective clients

91.    As a result of defendants' further conduct in intentionally and unjustifiably interfering with Nix's and DNA Sports Lab's online media platforms, Plaintiffs' ability to elicit and transact business worldwide was severely restricted and as a result Plaintiffs' lost millions of dollars' worth of existing clients and prospective business.

15

WHEREFORE, Plaintiff demands judgment against Defendants, where applicable, for all compensatory, emotional, and physical damages, punitive damages, lost pay, front pay, reinstatement, injunctive relief, and any other damages permitted by law. Plaintiff demands a trial by jury.

Dated: New York, New York
       July 13[th,] 2016

Respectfully submitted,

Vincent P. White, Esq
Attorney for Plaintiff
570 Lexington Avenue, 16th Floor
New York, New York 10022
(646) 690-8881

Vincent P. White

16